**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ALISON FLOWERS, PHILIP ROGERS, CAROL MARIN, ROBIN AMER, LINDSEY DORCUS, YOHANCE LACOUR, and VICTORIA NASSIF, each individually and on behalf of all others similarly situated, | ) | Case No. 1:26-cv-05491 |
| Plaintiffs, | ) | Hon. Steven C. Seeger |
| v. | ) | |
| MICROSOFT CORPORATION, | ) | |
| Defendant. | ) | |

**DEFENDANT MICROSOFT CORPORATION'S REPLY IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' COMPLAINT**

## INTRODUCTION

BIPA regulates "voiceprints," which are measurements of voices used to identify speakers. Plaintiffs do not contend that their voiceprints were collected when they used Microsoft speech-synthesis technology—indeed, they do not allege interacting with that technology at all. Nor do Plaintiffs plead facts showing that Microsoft otherwise collected or possessed such a measurement of any Plaintiff. Instead, Plaintiffs allege that: (1) Microsoft trained speech-synthesis models on large amounts of publicly available audio; (2) Plaintiffs' recordings are publicly available audio; and (3) *other* Microsoft technologies—distinct from those that produce synthetic voices—can perform speaker identification. Therefore, according to Plaintiffs, voiceprints of Plaintiffs' voices "must" be somewhere inside Microsoft's speech-synthesis models. As Microsoft showed, that theory is "a series of speculative guesses stacked one upon another," (Dkt. 18-1 ("Mem.") at 1), not a plausible claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (complaint must include enough facts to "raise a right to relief above the speculative level.")

Instead of addressing the Complaint's insufficiencies, the Opposition recasts Plaintiffs' central theory regarding the alleged "voiceprints" Plaintiffs contend Microsoft collected and possessed. The Complaint alleges voiceprints "encoded in the parameters of Microsoft's commercial voice models," (*see, e.g.*, Compl. ¶¶ 8, 83); the Opposition now rests the BIPA Section 15(b) claim on a *different* set of alleged voiceprints—"speaker-identifying representations Microsoft allegedly obtained during training," (Dkt. 21 ("Opp.") at 2), while Plaintiffs' remaining claims still depend on the "encoded in the parameters" allegations in the Complaint. Neither theory is supported by facts sufficient to state a plausible claim.

The Court should dismiss the Complaint for at least four reasons:

First, all of Plaintiffs' claims fail because they do not plausibly allege that Microsoft used

their recordings at all. The Opposition's five "grounds" for that inference (Opp. at 4-5) reduce to generic descriptions of Microsoft's model training, the fact that Plaintiffs' recordings are publicly available, and a restatement of the inference itself. None makes it plausible that Plaintiffs' recordings appear in any dataset Microsoft used.

Even if Plaintiffs had plausibly alleged that Microsoft used their recordings (they have not), their BIPA claims all fail because they do not plausibly allege that Microsoft thereby collected or possessed their *voiceprints*. The Microsoft documentation Plaintiffs cite for the terms "voice signature" and "voiceprint" describes speaker-verification tools no Plaintiff alleges using, not synthetic speech model training (Opp. at 8; Dkt. 21-5 at 14, 16; Compl. ¶¶ 34, 85), and the lone research-paper reference to "predicting … speaker ID" (Opp. at 8) is tied to no commercial model and no actual person.

Second, Plaintiffs' BIPA Section 15(c), 15(d), and 15(e) claims fail for additional, independent reasons. Plaintiffs' recast Section 15(c) "paid access" theory is unpleaded and unsupported by any facts showing that generated speech conveys "access" to a voiceprint (Opp. at 13-14); their narrowed Section 15(d) theory still pleads no disclosure or dissemination (*id.* at 14-15); and their Section 15(e) claim remains their notice, consent, and retention claims under a different heading (*id.* at 15-16).

Third, Plaintiffs' BIPA claims fail for the independent reason that Plaintiffs plead no violative conduct by Microsoft in Illinois. Plaintiffs' theory that a violation occurs wherever the subject of an allegedly missing notice or policy happens to be (Opp. at 17) is residency by another name, and courts have repeatedly rejected it.

Fourth, Plaintiffs' remaining claims under the Illinois Right of Publicity Act, Consumer Fraud Act, and Uniform Deceptive Trade Practices Act, and for unjust enrichment, fail with their

BIPA theory and on their own elements. Plaintiffs still identify no Microsoft output that sounds like any of them, no listener who recognized one, and no instance in which Microsoft held out a synthetic voice as a Plaintiff's. They abandon the Consumer Fraud Act deception theory the Complaint pleaded (Opp. at 27) and concede that their unjust-enrichment claim "rests on the BIPA and IRPA violations" (*Id.* at 29).

The Complaint should be dismissed in its entirety.

## ARGUMENT

### I. PLAINTIFFS DO NOT PLAUSIBLY ALLEGE THAT MICROSOFT COLLECTED OR POSSESSED THEIR VOICEPRINTS.

#### A. The Complaint Does Not Plausibly Allege That Microsoft Used Plaintiffs' Recordings.

Every BIPA count requires that Microsoft collected or possessed a Plaintiff's biometric identifier—which would require, in the first instance, that Microsoft used Plaintiffs' voices to train its technology. As the motion explained, the Complaint's only factual allegation connecting Plaintiffs to Microsoft's training data is that their professional work "matches the profile" of "optimal" training audio—an inference about categories of audio, not an allegation that any Plaintiff's recordings were in any training set. (Mem. at 6-7.)

Plaintiffs respond that the Complaint pleads five "grounds" supporting the inference they need. (Opp. at 4-5.) Four of the five grounds are that: (1) Microsoft keeps training records; (2) its research corpora are large; (3) a 2020 Microsoft research paper described mining songs; and (4) Plaintiffs' recordings have long been online—none distinguishes Plaintiffs from any other professional speaker in the country. (*Id.*) The fifth ground is that Microsoft "acquired recordings from YouTube, Spotify, Apple Podcasts, and Audible that bore each Plaintiff's name." (Opp. at 5, citing Compl. ¶¶ 61-62.) That is not a fact that supports the inference; it is the inference itself, restated. (*Cf.* Opp. at 5 (explaining that "inclusion is pleaded circumstantially").) Under *Iqbal*,

allegations of that kind are set aside before the court asks whether the remaining facts plausibly suggest liability. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

The documents Plaintiffs attach do not help them. Plaintiffs assert that Microsoft research papers "show training beyond public-domain audiobooks" and reference three papers. (Opp. at 5.) Plaintiffs then point to a Microsoft Research web page to argue that Microsoft research models were used to train commercial products. (*Id.* (citing Opp. Ex. G, Dkt. 21-9).) The page lists three transferred technologies, none of which are addressed in the three research papers the Opposition relies on. (Dkt. 21-9 at 2.) Plaintiffs also rely on the VALL-E paper's statements that its 60,000-hour corpus "cannot cover everyone's voice" and that the authors "will further scale up the training data" (Opp. at 5), but a stated plan to gather more data is not an allegation that Microsoft gathered Plaintiffs' data. Plaintiffs do not allege that NaturalSpeech 3 was ever transferred into a commercial product. And the DeepSinger paper describes a corpus of about 92 hours of songs by 89 singers. (Dkt. 21-7 at 2, 4.) Plaintiffs concede it does not show that Microsoft took their podcasts. (Opp. at 5.)

That leaves *Brantley*, which holds that "where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Brantley v. Prisma Labs, Inc.*, 2024 WL 3673727, at *3 (N.D. Ill. Aug. 6, 2024) (quoting *Strautins v. Trustwave Holdings, Inc.*, 27 F. Supp. 3d 871, 881 (N.D. Ill. 2014)). Plaintiffs say the case is distinguishable because the dataset there was publicly searchable and because the court ruled on standing rather than under Rule 12(b)(6). (Opp. at 7.) Neither distinction matters. The court resolved a facial challenge to Article III jurisdiction, which applies the same plausibility standard as Rule 12(b)(6). *Brantley*, 2024 WL 3673727, at *3; *see also Silha v. ACT, Inc.*, 807 F.3d 169, 173-74 (7th Cir. 2015). Applying *Iqbal*, the *Brantley* court

held that a plaintiff with a "prolific social media presence" had not plausibly alleged that his photographs were in a dataset scraped from "almost every website," because those facts were "merely consistent with" inclusion. 2024 WL 3673727, at *4-6. The searchability of the dataset bore on a different question, whether the facts were "peculiarly within the possession and control of the defendant" so as to permit pleading on information and belief. *Id.* at *5. Pleading on information and belief excuses a plaintiff from pleading what she cannot know; it does not excuse her from pleading facts that make the unknown fact plausible, and a company's superior knowledge of its own systems does not relieve a BIPA plaintiff of that burden. *G.T. ex rel. Hanlon v. Samsung Elecs. Am., Inc.*, 186 F.4th 470, 477 (7th Cir. 2026). *Heard v. Becton, Dickinson & Co.* (Opp. at 7) is inapposite: the plaintiff there pleaded that his fingerprints were stored on the defendant's own servers. 524 F. Supp. 3d 831, 840 (N.D. Ill. 2021). Here, Plaintiffs allege nothing more than that their voices *could* be in Microsoft's training data, which falls short of what *Iqbal*, *G.T.*, and *Brantley* require.

Finally, Plaintiffs say that an output resembling a Plaintiff's voice "is not an element" of a Section 15(b) claim, yet concede that one "would corroborate use." (Opp. at 8.) But the defect in the Complaint is not so easily avoided: a pleading alleging a taking that cannot point to a single trace of what was taken, in the one corpus it names, in any output, or anywhere else, has not moved "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570.

**B. Plaintiffs Do Not Plausibly Allege That Microsoft Collected a "Voiceprint."**

Even if the Complaint plausibly alleged that Microsoft trained synthetic speech models using Plaintiffs' recordings, it would still have to plausibly allege that Microsoft thereby collected a *voiceprint*. Plaintiffs concede, as they must, that to constitute a voiceprint regulated under BIPA, voice data must be capable of identifying a person. (Opp. at 9; Mem. 8-9;) *Zellmer v. Meta*

*Platforms, Inc.*, 104 F.4th 1117, 1124-25 (9th Cir. 2024); *Carpenter v. McDonald's Corp.*, 580 F. Supp. 3d 512, 518 n.2 (N.D. Ill. 2022). Plaintiffs' three arguments that they have done so each fail.

First, Plaintiffs say that "Microsoft's documentation uses the statute's word." (Opp. at 8.) It does, but to describe something else. The relevant sentence appears on Microsoft's Azure Speech data-privacy page, under a heading describing how Microsoft verifies a customer's voice talent before building a custom voice. (Dkt. 21-5 at 14.) Azure AI Speaker Verification compares the talent's recorded acknowledgment statement with the customer's training audio to confirm that the "voice signature[s]" match; such a signature "may also be called a 'voice template' or 'voiceprint,'" and is used "solely for the purposes of speaker verification" or to investigate misuse. (*Id.* at 14, 16.) The same page describes the training of the speech synthesis model itself very differently. Training audio is "decomposed into fine-grained mappings of voice acoustics and text, such as a sequence of phonemes," and the resulting "voice model . . . represents a set of parameters in binary format that isn't human readable and doesn't contain audio recordings." (*Id.* at 14-15.) Plaintiffs concede that the page "supplies terminology, not the factual basis" for their claim (Opp. at 9), and no Plaintiff alleges that her voice passed through Speaker Verification. (Compl. ¶ 85.)

Second, Plaintiffs rely on a sentence in the NaturalSpeech 3 research paper stating that the model's training applies "speaker classification . . . by predicting the speaker ID." (Opp. at 8.) In context, that sentence describes an auxiliary technique used while training the paper's audio codec to separate the quality of a voice from the words being spoken. (*See* Dkt. 21-3 at 4.) Plaintiffs do not allege that the "speaker ID" classifier's output is kept, that the "speaker ID" numbers correspond to names, or that NaturalSpeech 3 ever was deployed as a product (it was not). Nor does the paper describe "speaker-specific processing" (Opp. at 8): NaturalSpeech 3 is a "zero-shot" system (*see* Dkt. 21-3) whose similarity scores measure resemblance between the user's

prompt and the output, not resemblance to anyone in the training data. (Dkt. 21-3 at 9-10.) That is why the paper warns of misuse by a *user* supplying another's voice as the prompt and the authors note that their experiments assumed "the user agree[s] to be the target speaker." (Dkt. 21-3 at 13.)

Third, Plaintiffs fail to respond to Microsoft's showing (Mem. at 8-9) that the Complaint pleads no facts plausibly alleging that Microsoft processed any Plaintiff's voice to identify her, or that its models' stored data, parameters, embeddings, code, or audio outputs can be used to identify any Plaintiff. Plaintiffs protest that a "collector need not have an identification purpose" (Opp. at 9), but the absence of such a purpose bears on whether collection of a voiceprint is plausibly alleged.

For all of the reasons above, Plaintiffs fail to plausibly allege that Microsoft collected or possessed their voiceprints, and Plaintiffs' BIPA claims should be dismissed in their entirety.

## II. THE BIPA SECTION 15(c), 15(d), AND 15(e) CLAIMS FAIL FOR ADDITIONAL REASONS.

Plaintiffs assert Microsoft "does not separately challenge Count II" (Opp. at 12), but Part I of the motion attacks each BIPA claim, and Count II, which requires that Microsoft *possess* a biometric identifier, falls with the rest. Counts III-V also fail for the additional reasons below.

*Section 15(c)* prohibits a private entity from selling, leasing, trading, or otherwise profiting from a person's biometric identifier. Each term describes a transaction in the biometric data itself. (*See* Mem. at 11-12.) Plaintiffs abandon most of Count III, disclaiming Copilot, Teams, Dynamics 365, and Nuance revenue and the theory that revenue from products "merely improved by past training" is profit under Section 15(c). (Opp. at 14.) What remains is a theory of "paid access": customers who pay for synthesized speech allegedly receive speech that "reproduces Plaintiffs' retained, speaker-identifying characteristics." (*Id.* at 13.) But a customer who sends text to Azure and receives audio in the form of one of hundreds of standard voices (Dkt. 21-8 at 38) has not been

given "access to biometric data," as Plaintiffs' own authority requires. *Vance v. Microsoft Corp.*, 534 F. Supp. 3d 1301, 1307-09 (W.D. Wash. 2021); *Vance v. Amazon.com Inc.*, 534 F. Supp. 3d 1314, 1322-24 (W.D. Wash. 2021). Plaintiffs also concede that "delivering audio" to customers does not transfer alleged identifiers. (Opp. at 18.) If delivering audio transfers no identifier, it provides no access to one.

*Section 15(d)* prohibits disclosure or dissemination of a person's biometric identifier. Plaintiffs narrow the dissemination theories the Complaint pleaded, now resting on alleged transfers of models among Microsoft's affiliates and cloud vendors. (Opp. at 14-15.) Those allegations are the kind of recital the motion identified: "on information and belief," the business "requires" transfers "in the ordinary course of business." (Compl. ¶¶ 71-72.) No transfer, date, or model is identified, and naming three corporate affiliates does not supply facts about what allegedly moved between them. *Carpenter*, 580 F. Supp. 3d at 519.

*Section 15(e)* requires an entity in possession of biometric data to store, transmit, and protect it from disclosure with reasonable care. Microsoft did not argue that Section 15(e) requires a data breach. (Opp. at 15.) It argued that Count V says nothing about how any data is stored, transmitted, or protected. The "safeguards" Plaintiffs say Microsoft lacks are "no mechanism to access, correct, or seek deletion of their data, or to verify or challenge its retention and disclosure." (*Id.* at 16.) Those are the notice, consent, and retention obligations of Sections 15(a) and 15(b), restated under a different heading.

*Rodriguez* and *Hayes* (Opp. at 16) do not help Plaintiffs. Both involved defendants whose possession of biometric data was plausibly alleged at the threshold—users of the defendant's own video-editing app in *Rodriguez v. ByteDance, Inc.*, 2025 WL 2495865, at *1 (N.D. Ill. Aug. 29, 2025), and employees who scanned into the defendant's own fingerprint timekeeping system in

*Hayes v. CGB Enters., Inc.*, 2024 WL 3091083, at *1 (C.D. Ill. June 20, 2024)—and Section 15(e)'s duties run only to an entity "in possession of" biometric data. 740 ILCS 14/15(e). Nor does either case hold what Plaintiffs need. *Rodriguez* sustained a Section 15(e) claim on allegations about how the defendant actually stored and transmitted its users' data, 2025 WL 2495865, at *11; it did not hold that a complaint silent about storage, transmission, and protection states a claim by reciting those words. *Hayes* sustained a comparison between the defendant's existing policy protecting its website users' online data and the absence of any corresponding policy for employees' biometric data. 2024 WL 3091083, at *6-7. The Complaint describes safeguards Microsoft allegedly affords other categories of data (Compl. ¶ 169) but is silent on how any alleged voiceprint is in fact stored, transmitted, or protected—and Plaintiffs' own concession that an unpublished safeguard is not an absent one (Opp. at 16) both forecloses filling that silence with inference and disposes of their reasonable-care theory, which rests on what Microsoft "has not published." (Compl. ¶ 174.)

## III. PLAINTIFFS PLEAD NO RELEVANT CONDUCT BY MICROSOFT IN ILLINOIS.

BIPA has no extraterritorial reach, and a plaintiff must plead that the circumstances of the alleged violation occurred "primarily and substantially" in Illinois. (Mem. at 14-15.) The Complaint pleads three things about Illinois: Plaintiffs live here and made their recordings here; Microsoft's alleged extraction was "directed at Illinois, regardless of the physical location of the servers"; and Microsoft sells its products to Illinois customers. (Compl. ¶¶ 13-19, 24; *see also* Mem. at 2, 15.) None of those is conduct by Microsoft in Illinois that allegedly violated BIPA.

Plaintiffs' principal answer is that because Section 15(b) requires notice to "the subject," the place "[w]here those conditions went unmet" is where the violation occurred. (Opp. at 17.) That argument would relocate every alleged BIPA violation to wherever the plaintiff happens to

be. It is residency by another name, and it is the theory the courts rejected in *Campana* and *McGoveran*, where Illinois residents on the telephone in Illinois could not show any relevant Illinois conduct by the defendant. *Campana v. Nuance Commc'ns, Inc.*, 2024 WL 2809838, at *2-3 (N.D. Ill. Mar. 8, 2024); *McGoveran v. Amazon Web Servs., Inc.*, 175 F.4th 434, 441-42 (3d Cir. 2026). *Avery v. State Farm Mutual Automobile Insurance Co.* does not support Plaintiffs either. The nondisclosure there counted in Louisiana because the defendant's dealings with the plaintiff took place there, and Illinois law did *not* govern even though the challenged policy had been devised in Illinois. 216 Ill. 2d 100, 187-88 (2005). Here, Plaintiffs allege no dealing between Microsoft and any of them anywhere—let alone in Illinois. (Compl. ¶ 85.)

Plaintiffs argue that the location of Microsoft's alleged BIPA violations does not matter because Microsoft "targeted … Illinois-origin material." (Opp. at 17.) That construct, however, comes from personal-jurisdiction law, where the question is whether a defendant "purposefully directed" conduct at a forum. *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 886 (2011). The *Avery* inquiry asks a different question—where the events making up the violation happened—and a Chicago office and Illinois customer contracts (Compl. ¶ 23) do not answer it. *See Wilk v. Brainshark, Inc.*, 631 F. Supp. 3d 522, 528-29 (N.D. Ill. 2022) (distinguishing the *Avery* extraterritorial doctrine analysis from personal jurisdiction).

The cases Plaintiffs cite each involved conduct by the defendant in Illinois. In *Rivera*, *Jiles*, and *Monroy*, Illinois users uploaded photographs to the defendant's own service. *Rivera v. Google Inc.*, 238 F. Supp. 3d 1088, 1101-02 (N.D. Ill. 2017); *Jiles v. Au10tix Ltd.*, 2026 WL 1693581, at *1, 7 (N.D. Ill. June 10, 2026); *Monroy v. Shutterfly, Inc.*, 2017 WL 4099846, at *5-6 (N.D. Ill. Sep. 15, 2017). Here, by contrast, Plaintiffs published their recordings to third-party platforms, from which Microsoft allegedly acquired them at some unidentified place; no Plaintiff is alleged

to have sent anything to Microsoft directly. On materially identical facts, *Vance v. Microsoft Corp.* held that Illinois residence and the Illinois origin of the photographs were not enough, and that even storage on an Illinois server would have been "too attenuated." 2022 WL 9983979, at *7-8 (W.D. Wash. Oct. 17, 2022). In *Clearview*, the defendant contracted with "hundreds of Illinois entities" to sell a database containing biometric information to Illinois law-enforcement customers who used it to identify Illinois residents. *In re Clearview AI, Inc. Consumer Privacy Litig.*, 585 F. Supp. 3d 1111, 1121 (N.D. Ill. 2022). Plaintiffs here have not alleged that any similar conduct took place between Microsoft and any Illinois entities.

Assessing each count separately, as Plaintiffs request (Opp. at 18), does not help them. For Counts II, IV, and V, the Illinois connection identified is Microsoft's Illinois customers, but Plaintiffs concede that serving those customers "does not . . . transfer[] model weights to them." (*Id.*) The transfers actually alleged run among Microsoft entities in Washington, the Netherlands, and Ireland. (Compl. ¶ 71.) For Count III, the Illinois transactions Plaintiffs plead are Azure subscriptions and audio deliveries that, by the same concession, convey no biometric identifier. And for Count I, the Illinois ties are where the recordings were made and where Plaintiffs live, facts that, as Plaintiffs note, "identify the sources and speakers, not … extraction." (Opp. at 18.)

At bottom, Plaintiffs plead no conduct by Microsoft in Illinois, and the BIPA claims fail for this independent reason.

## IV. THE NON-BIPA CLAIMS SHOULD BE DISMISSED.

### A. Plaintiffs Fail to Plead a Right of Publicity Act Claim.

The Right of Publicity Act ("IRPA") protects a person's identity, and the motion explained that the Complaint identifies no Microsoft voice that sounds like a Plaintiff, no listener who recognized one, and no instance in which Microsoft held a synthetic voice out as a Plaintiff's. (Mem. at 16-17.) Plaintiffs respond that the Complaint "traces each Plaintiff's voice from

recording to output" (Opp. at 20), but it alleges only that synthesized speech "exhibits the acoustic features of the training voices" (Compl. ¶ 33), which on the Complaint's account number in the thousands. A voice that blends features of thousands of speakers is no one's identity. The allegations that Microsoft's outputs "replicate or closely simulate" Plaintiffs' voices (*id.* ¶¶ 182, 198) are made on information and belief, identifying nothing. *Dancel v. Groupon, Inc.* holds that whether an attribute identifies a person requires comparing a particular use of the attribute with the plaintiff, 949 F.3d 999, 1008-09 (7th Cir. 2019); Plaintiffs identify no use to compare. And the "source human voice" that Custom Neural Voice reproduces "nearly identical[ly]" (Compl. ¶ 181) is the customer's own voice talent, who has consented in writing. (Dkt. 21-8 at 4-5.)

The statute's remaining elements confirm the result. Section 30(a) requires that the identity be used "to aid, effectuate, or propose a commercial transaction." *Huston v. Hearst Commc'ns, Inc.*, 53 F.4th 1097, 1100-02 (7th Cir. 2022). The identity must itself help sell the product; it is not enough that the identity appears on or within it. *Id.* at 1100. Advertising that a product *can* produce realistic speech is not a use of any Plaintiff's identity. *Trannel v. Prairie Ridge Media, Inc.* (Opp. at 21) involved a photograph of the plaintiff in the defendant's sales materials, not an image blended from thousands of photographs that *allegedly* included the plaintiff's. *See* 2013 IL App (2d) 120725, ¶¶ 4, 21-22. Meanwhile, Plaintiffs agree that *Hoffower v. Seamless Contacts Inc.*, 736 F. Supp. 3d 605 (N.D. Ill. 2024), requires "actual holding out" (Opp. at 22), and the Complaint alleges none. Were Plaintiffs' allegations sufficient, every seller of a product capable of generating a human-sounding voice would face a Section 30(a) claim.

Turning to the IRPA's digital-replica provisions, Sections 30(b) and 30(d) require "actual knowledge that the work contains an unauthorized digital replica," which is knowledge about a particular work and a particular person, not knowledge about what was in a training set. 765 ILCS

1075/30(b). Awareness that something might be happening, which further investigation could uncover, is not actual knowledge. *Doe v. Galster*, 768 F.3d 611, 617-18 (7th Cir. 2014). And the allegation that Microsoft's outputs are unauthorized digital replicas of Plaintiffs (Compl. ¶ 182) is a conclusion, not a well-pleaded fact. *Roake v. Forest Pres. Dist. of Cook Cnty.*, 849 F.3d 342, 347 n.4 (7th Cir. 2017). Rule 9(b) permits knowledge to be alleged generally, but it does not excuse a plaintiff from Rule 8. *Iqbal*, 556 U.S. at 686-87.

As for preemption, Microsoft's argument is the limited one the motion made. In *Toney* and *Midler*, the defendant actually used the plaintiff's identity—a photograph of the plaintiff on a package, *Toney v. L'Oreal USA, Inc.*, 406 F.3d 905, 910 (7th Cir. 2005), and a "sound-alike" singer asked to imitate plaintiff's voice, *Midler v. Ford Motor Co.*, 849 F.2d 460, 463 (9th Cir. 1988). Once the unpleaded use of identity is set aside, what remains of Count VI is a complaint that Microsoft copied Plaintiffs' *recordings*—the province of copyright. *Seng-Tiong Ho v. Taflove*, 648 F.3d 489, 501 (7th Cir. 2011).

### B. Plaintiffs Fail to Plead a Consumer Fraud Act Claim.

The Complaint pleaded a deception theory based on three things: "hedging language" in Microsoft's documentation, Microsoft's disclosure to voice talent, and Microsoft's "opacity" about its training data. (Compl. ¶ 191.) The Opposition abandons that theory, calling those documents "context" and stating that Plaintiffs "do not claim they read or relied on them." (Opp. at 27.) A plaintiff cannot be deceived by a statement she never saw. *De Bouse v. Bayer AG*, 235 Ill. 2d 544, 554-56 (2009). In its place, Plaintiffs offer a new theory: that the deceptive "omission" was Microsoft's failure to deliver the written notice Section 15(b) requires. (Opp. at 26-27.) That theory appears nowhere in the Complaint, and Plaintiffs concede it is "not settled." (*Id.* at 27.) Theories raised for the first time in an opposition brief will rarely be treated as an amendment of the complaint. *Schmees v. HC1.com, Inc.*, 77 F.4th 483, 490 (7th Cir. 2023). *De Bouse* forecloses

that theory too: omissions are actionable only when they occur within a communication that actually reached the plaintiff. 235 Ill. 2d at 554-56.

The unfairness theory fails as well. Its public-policy prong rests on BIPA and IRPA (Opp. at 24), and conduct that violates neither statute does not offend the policy of either. *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 831-34 (7th Cir. 2014). Its oppression prong, that Plaintiffs "could not avoid a taking they did not know about" (Opp. at 25), is the BIPA notice claim again. As *Robinson v. Toyota Motor Credit Corp.* makes clear, an oppressive transaction is one in which a consumer is coerced into submission. 201 Ill. 2d 403, 420 (2002).

Plaintiffs further concede that they do not contend "that Microsoft's avoided costs are their loss, or that consumers are protected merely because they are ultimately affected." (Opp. at 25-26.) What remains is a claim by non-consumers for competitive harm. That other non-consumers were treated the same way (*id.* at 25) is not a consumer-protection concern. *Thrasher-Lyon v. Ill. Farmers Ins. Co.*, 861 F. Supp. 2d 898, 911-12 (N.D. Ill. 2012).

And neither category of damages Plaintiffs describe survives their own concessions. Diverted licensing income that Microsoft never paid is Microsoft's avoided cost, not Plaintiffs' loss. *Dinerstein v. Google, LLC*, 73 F.4th 502, 518 (7th Cir. 2023). Market displacement, by Plaintiffs' own description, does not require a "recognizable replica" because "a synthetic narrator can displace a human one without sounding like her." (Opp. at 26.) A loss that flows from the existence of synthetic narration is not proximately caused by the unfair acquisition of Plaintiffs' data. *Tri-Plex Tech. Servs., Ltd. v. Jon-Don, LLC*, 2024 IL 129183, ¶¶ 26, 37. Had Microsoft sent every Plaintiff the notice they allege Section 15(b) requires, synthetic narration would exist all the same, and the competitive harm Plaintiffs describe would be unchanged. *See Haywood v. Massage*

*Envy Franchising, LLC*, 887 F.3d 329, 333-34 (7th Cir. 2018) (affirming dismissal where ICFA plaintiff could not establish the alleged deception but-for cause of her injury).

**C. Plaintiffs Fail to Plead a Deceptive Trade Practices Act Claim.**

Plaintiffs now disclaim any contention that "realistic synthetic speech identifies anyone by itself" or that the Act imposes a general duty to label artificial intelligence. (Opp. at 28.) The claim can therefore succeed only if some Microsoft output is recognizable as a particular Plaintiff, and that is not alleged. And the future harm the Complaint pleads is not misattribution; it is conduct that "diverts demand from licensed human voice performances." (Compl. ¶ 199.) Diverted demand is lost business, not harm an injunction can redress. *ATC Healthcare Servs., Inc. v. RCM Techs., Inc.*, 282 F. Supp. 3d 1043, 1050 (N.D. Ill. 2017). Nor would the disclosure Plaintiffs seek address the confusion they posit: a customer generating speech with Microsoft's tools is not confused about whether a Plaintiff made it, and any later confusion would arise from how that customer or others distribute the output—conduct Microsoft does not control. (Mem. at 24;) *Perdue v. Hy-Vee, Inc.*, 455 F. Supp. 3d 749, 773 (C.D. Ill. 2020).

**D. The Unjust-Enrichment Claim.**

Plaintiffs concede this claim "rests on the BIPA and IRPA violations" (Opp. at 29), so it fails with them. *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011). It also fails on its own terms: the "measure" of benefit Plaintiffs identify is the license fee Microsoft never paid them (Opp. at 30), which is a defendant's gain without a plaintiff's loss. *Dinerstein*, 73 F.4th at 518.

## CONCLUSION

For the reasons set forth above and in the opening memorandum, Microsoft respectfully requests that the Court enter an Order dismissing the Complaint in its entirety.

Dated: October 14, 2026

Respectfully submitted,

MICROSOFT CORPORATION

By: */s/ David C. Layden*
One of its attorneys

David C. Layden
Savannah E.B. McNeily
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, Illinois 60654-3456
Telephone: (312) 222-9350
DLayden@jenner.com
SMcNeily@jenner.com